**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN**

---

DANIEL CHRISTENSEN and PAULA CHRISTENSEN
As Next of Kin to DONNA CHRISTENSEN, Deceased,
and as Administrators of her Estate,

     Plaintiffs,

v.                                                                                          Case No. 3:22-cv-253

WILLIAM WEISS, SHERIFF JOSEPH FATH, VILAS
COUNTY, KAYLA ANDERSON, OFFICER BRENT
WILMOT, and JOHN AND JANE DOE OFFICERS 1-10,

     Defendants.

---

**COMPLAINT**

---

NOW COME the above-named plaintiffs, by their attorneys, Havas and Joy, S.C. and McCoy Leavitt Laskey LLC, and as and for a cause of action against the above-named defendants, allege and show to the Court as follows:

**INTRODUCTION**

1.      Excessive punishments disproportionate to the offense are "cruel and unusual."

2.      The US Constitution's Eight Amendment prohibits against cruel and unusual punishment.

3.      The Eight Amendment requires the government to provide health care to prisoners, such that they cannot knowingly disregard a substantial risk of serious harm by failing to take reasonable measures to abate it.

4.      Upon her intake to Vilas County Jail, Donna Christensen ("Christensen") was extremely vulnerable.  After voluntarily coming to the jail following a technical parole violation,

she was suffering from her mental illness while undergoing major withdrawal from hard drugs, and had a history of suicide attempts.

5. Without any medical or psychological evaluation of her obvious medical needs, mental illness, and particular vulnerability to suicide, Christensen was placed into solitary confinement pending a COVID-19 test, where she had a severe mental breakdown.

6. During her mental breakdown, Christensen covered her cell door with tissue paper, which is an indication that an inmate may be suicidal. Corrections Officers Jane Doe noticed the condition and called Corrections Officer Brent Wilmot to respond.

7. As Christensen was laying on a mat on the floor and emerged from resting on the blanket on top of her, she tossed an empty Styrofoam food container out the door, not knowing that Officer Wilmot was standing outside, out of Christensen's view. The Styrofoam container glided into Wilmot's boot. In response, Wilmot pulled the blanket off Christensen and threw it in the hallway. He then pulled up the far side of Christensen's mat, which caused her to fall forward into him unintentionally and she touched Wilmot in her attempt to get away. Wilmot subsequently laid on top of Christensen and restrained her. On the basis of Christensen's actions, which were captured on video surveillance, defendants falsely charged Christensen with a "serious assault" and designated a "maximum security inmate." Moreover, Wilmot was proceeding to prosecute Christensen for a felony. Upon information and belief, the defendants' carried out the "serious assault" charge by denying Christensen her due process rights.

8. After Wilmot restrained Christensen, she had an obvious psychotic breakdown and expressed suicide intentions and extreme emotional problems, including repeatedly hearing voices telling her to kill herself. As a result, Christensen was placed on suicide watch.

2

9.      Without any medical evaluation or mental health treatment, defendants removed Christensen from suicide watch to make room for another suicidal inmate.

10.     Defendants knowingly failed to have someone qualified to evaluate mental health of inmates evaluate Christensen prior to removing her from suicide watch.

11.     Rather than follow the suicide screener's directive to return Christensen to the general population, defendants placed her back into prolonged solitary confinement—which had just triggered her suicidal breakdown.  Upon information and belief, Correction Officer Wilmot, with the knowledge of defendants, placed Christensen back into solitary confinement based on the unsupported charge of "serious assault" to subject her to further cruel and unusual punishment.

12.     After any possible disciplinary justification related to the purported "serious assault" had expired, defendants maliciously kept Christensen in solitary confinement for another ten (10) days without medical evaluation or treatment.  Further, defendants provided grossly inadequate supervision to Christensen and provided no explanation when the solitary torture would end.

13.     Ultimately, Christensen ended the defendants' cruel and unusual punishment by hanging herself with a blanket tied to the top of her bunk bed.

14.     The night of her death, Christensen was the only person in the entire D wing of the facility.  All the other cells were closed with their lights off.  Upon information and belief, for close to an hour before her death, Christensen repeatedly yelled and cried out "please help me"; "I can't do this."  The defendants knowingly offered no response to Christensen's pleas for help. Upon information and belief, a John Doe and Jane Doe Corrections Officer responded,  "go to hell"; "shut up"; and "shut the fuck up."



15.     The defendants knowingly and maliciously refused to provide Christensen with any medical care required to address her obvious mental illness, drug withdrawal and vulnerability to suicide.

16.     The defendants knowingly and maliciously placed Christensen into additional prolonged solitary confinement without any medical evaluation or treatment, despite obvious signs of a serious mental illness and vulnerability to suicide, which is inherently inadequate mental health care.

17.     The United Nations considers solitary confinement in excess of fifteen (15) days to be torture for individuals who do not exhibit obvious signs of unaddressed serious mental illness and particular vulnerability to suicide.

18.     Upon information and belief, the defendants each knowingly and maliciously subjected Christensen to inhumane conditions that constitute cruel and unusual torture, and was highly likely to result in her serious physical harm or death.

19.     The defendants each knowingly and maliciously subjected Christensen to prolonged cruel and unusual punishment and the opportunity to take her own life without adequate supervision.  The defendants knowingly and maliciously failed to intervene at numerous instances to make a simple referral to mental health services or intervene to save Christensen's life.

20.     As a result of defendants actions described herein, Christensen suffered extreme pain, suffering and ultimately death; and plaintiffs suffered extreme grief and outrage, a loss of society and companionship, funeral costs, and other economic and non-economic damages.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1367.

22.     Venue is proper in this district under 28 U.S.C. 1391(b) because the events giving rise to the claims asserted in the complaint occurred in this judicial district.

23.     Plaintiffs have properly and timely filed with the appropriate municipalities notice of the circumstances and notice of the claim.  All substantive and procedural requirements to file the instant lawsuit have been satisfied.

## PARTIES

24.     Donna Christensen, the decedent, was a twenty year old who was detained at Vilas County Jail in Eagle River, Wisconsin from October 1, 2020, until her suicide on October 26, 2020.  She was a Native American, and an enrolled member of the Lac de Flambeau Ojibwe tribe.

25.     Plaintiffs Daniel and Paula Christensen, at all times relevant hereto, are adult citizens of the United States, residents of Wisconsin, and are the parents of Christensen, who died intestate and without any children.  Plaintiffs Daniel and Paula Christensen are the duly appointed administrators of her estate.

26.     Defendant William Weiss is the jail administrator for Vilas County Jail.  Weiss was given custody and charge of Christensen and was directly responsible for the health, safety, security, welfare and humane treatment of all inmates at Vilas County Jail.  At all times material hereto, defendant Weiss oversaw, supervised and had direct control over the management and operations of the entire Vilas County Jail, and was responsible for the Vilas County Jail's policies and procedures, as well as training.  The jail took deliberate action regarding providing no medical or psychological care to inmates, and further subjected inmates with obvious need of mental health care to prolonged solitary confinement, which was a direct cause of the death of Christensen. Defendant William Weiss is sued here in his official capacity.

27.     Defendant Sheriff Joseph Fath is the Sherriff of Vilas County.  At all times relevant to the events at issue in this case, defendant Fath was employed by the Vilas County Sheriff's Department in the capacity of Sheriff. As such, he was acting under color of law. At all times relevant to the events at issue in this case, defendant Fath promulgated rules, regulations, polices, and procedures as Sheriff of Vilas County for the provision of mental health care by medical personnel and correctional personnel to detainees at the Vilas County Jail, as well as policies related to the placement of mentally ill people into prolonged solitary confinement without any consideration of their psychological or medical needs. Defendant Sheriff Joseph Fath is sued here in his official capacity.

28.     Defendant Vilas County is a county in the State of Wisconsin. It oversees the Vilas County Sheriff's Department, which, in turn, operates the Vilas County Jail.

29.     Defendant Kayla Anderson is a social worker employed by the Vilas County Jail during the relevant period. Kayla Anderson is an adult resident of the state of Wisconsin residing at 1348 Moonlite Drive, Eagle River, Wisconsin. At all times relevant to the events at issue in this

case, this defendant was acting under color of law and within the scope of her employment with Vilas County Jail. Defendant Kayla Anderson defendant is sued here in her individual capacity.

30.    Defendants Sergeant Brent Wilmot, and defendants, John and Jane Doe Officers 1-10, were employees of the Vilas County Jail during the relevant period. Brent Wilmot is an adult resident of the state of Wisconsin residing at 3931 Horsehead Lake Road, Harshaw, Wisconsin. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with Vilas County Jail. These defendants are sued here in their individual capacities.

## FACTUAL ALLEGATIONS

31.    Christensen was originally a convict at Vilas County Jail for previously violating the terms of her parole.  She failed to be present at her scheduled office visit and failed to enroll in Wellness Court as referred by a circuit court order.

32.    Christensen's original crime was possession of drug paraphernalia.

33.    After violating the terms of her parole, Christensen initially admitted herself into custody at the Vilas County Jail on January 26, 2019.  During booking, Christensen stated that she was suicidal to multiple officers.  Christensen noted on her initial screening that she had attempted suicide more times than she could count.  The jail personnel noted scars on her wrists from cutting herself.  She was noted to be a daily meth user and requested mental health services for anxiety, depression and anger.  Jail staff also referred Christensen to mental health services due to concerns over coping with family issues.  Despite Christensen's obvious medical and mental health issues, the jail personnel failed to provide her with any medical evaluation or psychological treatment before she was released on May 6, 2020.  The lack of medical evaluation and creation of appropriate records caused Christensen to be undiagnosed within the jail.

7

34.    On or about October 1, 2020, Christensen turned herself into the custody of Vilas County Jail as a result of a parole violation.  Christensen's parole hearing date was November 16, 2020.

35.    Vilas County Jail tested Christensen for drugs, the results of which were positive for methamphetamines and cannabis.  Christensen also communicated that she had been on psychotropic medication previously for depression.

36.    Since her initial admission and throughout her stay at Vilas County, Christensen had numerous scars on her wrist from prior suicidal ideations and attempts, as found on her body after her death:



37.    Christensen had a particular vulnerability to suicide at the time that she was booked and remained so throughout her confinement at Vilas County Jail.

38.    On October 3, 2020, a corrections officer noted that Christensen needed to be seen by the nurse that morning for drug withdrawals.

39.    Vilas County Jail never provided a nurse to evaluate Christensen's medical condition or to provide treatment for the severe withdrawal she was experiencing upon admission.

40.    On October 4, 2020, a nurse came to give Christensen a test for COVID-19 but did not otherwise address Christensen's medical condition.  After the test, the Vilas County Jail placed

Christensen into prolonged solitary confinement in a tiny cell, despite obvious signs of drug withdrawals, mental illness, and vulnerability to suicide.



41.     On October 6, 2020, while in solitary confinement for medical segregation, Christensen reported she was extremely lonely.  Christensen broke down and started kicking her door and yelling for someone to get her out.  Christensen covered her solitary confinement cell window with toilet paper.  Correctional Officer Malone attempted to enter the cell to speak to Christensen, but Christensen was lying in front of her cell door at the time, exhausted.

42.     Officer Malone called correctional Officer Brent Wilmot for assistance.  Officer Malone had entered the cell while Office Brent Wilmot stood at the door.  Christensen was lying on the floor covered in her blanket.  Upon being summoned by the officers, Christensen threw an empty Styrofoam food container that inadvertently came to rest in Wilmot's vicinity.



43.     Officer Wilmot subsequently grabbed the blanket Christensen was using and threw it into the hallway.

44.     Officer Wilmot then grabbed the mat Christensen was lying on and pulled it up on the far side that caused her to fall forward into him unintentionally.

 

45.     Officer Wilmot proceeded to get on top of Christensen, aggressively restraining her.



46.     Christensen then stated "like that's gonna stop me from killing myself."  Officer Wilmot asked Christensen if she was going to kill herself and she responded, "watch me."

47.     Officers Malone and Wilmot brought Christensen to the changeover room and instructed her to put on a suicide smock, which she refused based on her negative experience during her prior stay at Vilas County Jail.

48.     Christensen then repeatedly told Officers Malone and Wilmot that she had voices in her head that told her to kill herself and she couldn't be alone in the cell anymore with the voices.  Christensen also stated that the voices shouldn't be there because she was in jail and they shouldn't have "followed her into jail."  She also claimed that she was "only normal when she is on meth."

49.     Officers Wilmot and Malone placed Christensen into a restraint chair until she would agree to change into the suicide smock.  While changing into the suicide smock, Christensen stated that she wanted vegan meals because "people are out and out eating people."  Christensen further told Officers Malone and Wilmot that she was bipolar.  Christensen was asked whether she was taking anything for her bipolar condition and she responded, "no but I should be."

11

50. The Vilas County Jail cavalierly refused to consider Christensen's bizarre behavior, psychotic break from reality, and self-reported and physical signs of mental distress as an obvious and serious mental illness that should be evaluated and treated by a licensed and qualified professional.

51. Christensen was forced naked into the uncomfortable suicide smock even though she had began menstruating and was placed into a suicide proof room.



52. On October 6, 2020, the Suicide Watch physical observation form shows that Christensen did not leave her bunk.

53. On October 6, 2020, Officer Wilmot had Christensen's security level assignment re-designated to 2, denoting an extremely high risk.

54. Wilmot maliciously filed the incident as a "serious assault," making Christensen a "maximum security inmate" and prosecuted her for a violent felony charge that could carry a hefty prison sentence.

55. On October 7, 2020, Christensen was evaluated by social worker Kayla Anderson ("Anderson"). Christensen confirmed to Anderson that she had been hearing voices "for a while"

that told Christensen to kill herself.  Christensen reported thoughts of self-harm "all the time" but denied any active plan to do so.  Anderson concluded that Christensen "presents an imminent risk to herself."

56.     Kayla Anderson is not a licensed and qualified medical or mental health professional who was capable of diagnosing and treating mental illness at the relevant times hereto.

57.     Without the requisite training, Kayla Anderson could not provide any medical evaluation or treatment for Christensen's obvious mental illness.

58.     Anderson and other defendants knowingly disregarded her lack of qualifications in this regard.

59.     Anderson and other defendants knowingly disregarded Anderson's professional obligation as a licensed non-clinical social worker to limit her practice according with her qualifications.

60.     During October 7, 2020, the physical observation form shows that Christensen was catatonic, did not leave her bunk and had no interaction with anyone.

61.     On October 8,, 2020, Christensen was temporarily removed from suicide watch to make room for another suicidal inmate.

62.     During October 8, 2020, the physical observation form shows that Christensen otherwise did not leave her bunk and had no communications with anyone until 11:45 a.m. when an officer talked with her shortly before she spoke to social worker Anderson.

63.     On October 8, 2020, in a fifteen minute interview, Christensen told Anderson that she was going through withdrawals but told Anderson she had no more thoughts of self-harm. Without any evaluation by a qualified and licensed medical or mental health clinician, Anderson

relied entirely on Christensen's self-reporting that she did not present an imminent risk to herself or others.

64. Anderson released Christensen from suicide watch without making any reasoned assessment or evaluation of her motivation to be removed from suicide watch, her mental illness or ongoing suicide risk (particularly if subjected to further conditions of solitary confinement).

65. Upon information and belief, Anderson knowingly disregarded that her evaluation of Christensen for suicidal vulnerability was outside the scope of her licensure.

66. Upon information and belief, defendants knowingly failed to have Anderson supervised by anyone who is qualified to evaluate mental illness and vulnerability to suicide.

67. Upon information and belief, defendants knowingly failed to have Christensen evaluated by a qualified mental health care professional contrary to their own policies and procedures.

68. Anderson recommended that Christensen return to the general population with no increased observation or outpatient counseling.

69. On October 8, 2020, Christensen's COVID-19 test came back negative.

70. Christensen was moved to another cell while still in the suicide smock. There, she removed the suicide smock, before being moved into another cell briefly, and then was moved to solitary confinement in the D wing.

71. Instead of returning to the general population as directed by Anderson, a John Doe Corrections Officer knowingly disregarded the order and returned Christensen into solitary confinement. Upon information and belief, the John Doe Corrections Officer was acting under the direction of Correction Officer Wilmot based on the false "serious assault" charge, despite the individual defendants' knowledge that the charge was false, and the high probability that exposing

14

Christensen to the same conditions would be highly likely to trigger another mental breakdown and potential suicidal attempt.

72.    After her release from suicide watch, Christensen was placed in solitary confinement for the remainder of her stay at the Vilas County Jail until she died of suicide by hanging on October 26, 2020.  Upon information and belief, John Doe Corrections Officers, including Corrections Officer Wilmot, had inappropriate and unsupervised contact with Christensen during this time, and maliciously subjected her to humiliation and abuse.

73.    On October 12, 2020, Christensen had a visit with social worker Anderson. Anderson noted that Christensen relayed that she was "bipolar."  Rather than consider a referral to a qualified and licensed medical or mental health professional, Anderson gave a "provisional" and nonmedical diagnosis of "situational distress" and "polysubstance abuse disorder," and noted she is experiencing trauma from her incarceration.  Anderson labeled Christensen as MH-1, indicating Christensen had a mental health need but it was "not serious."  Anderson noted that Christensen was "stable" in general population, despite that Christensen was in solitary confinement, plainly reflecting the inadequacy of the interview.  Anderson failed to refer Christensen for further medical or psychological evaluation.

74.    On October 16, 2020, Christensen was no longer under administrative segregation as a result of the unsupported "serious assault" charge brought by Officer Wilmot.  After this point, there was no colorable basis to continue housing Christensen in solitary confinement.

75.    On October 16, 2020, Christensen first saw the jail nurse for her mandatory medical screening while in solitary confinement, although the medical check was delayed a day past the jail's own policy.

15

76. Despite ample evidence of mental illness in the prison records and presence in solitary confinement, upon information and belief, the nurse did not evaluate Christensen's mental health in terms of her continued suitability for prolonged solitary confinement.

77. The delay and ongoing lack of any medical care directed to Christensen mental illness and suicidal vulnerability was in violation of her constitutional rights. Defendants missed numerous opportunities to make a simple referral to a qualified mental health professional.

78. On the day of her death, and for some unknown time previous, Christensen was the only person occupying a cell in the entire D block, while the remainder of them were empty and dark. Christensen was heard crying loudly in her cell for ten minutes by another inmate who also happened to be her cousin. Another inmate heard her pleading with guards for her life, crying and screaming for help, and to be let out. Christensen was heard saying "help me," "I can't do this," and "please help me."

79. Upon information and belief, a John Doe Corrections Officers responded to Christensen's pleas for her life with demeaning and insensitive remarks.

80. Christensen committed suicide by fashioning a noose out of her bedding, and tying it to the post of her bunk bed within her cell.

81. The policies and procedures of the Vilas County Jail failed to provide Christensen with any meaningful medical evaluation or treatment for her obvious mental illness, drug withdrawal, and vulnerability to suicide.

82. The obvious danger to Christensen could have been easily averted at a slight cost of placing Christensen in a mental hospital or otherwise providing treatment for her mental illness, drug withdrawal, and suicidal vulnerability.

83. The defendants knowing placement of someone like Christensen, with obvious mental illness and vulnerability to suicide, into further prolonged solitary confinement was highly likely to cause her to suffer a psychotic breakdown, immense mental suffering and eventual suicide, which was a *per se* violation of Christensen's constitutional rights and cause of her suffering and death.

84. Defendants knowingly kept Christensen in solitary confinement past any procedural justification, which was a *per se* violation of Christensen's constitutional right against cruel and unusual suffering, and was a cause of her death.

85. Defendants knowingly placed Christensen in solitary confinement in a wing with no other prisoners whatsoever to further isolate her is a *per se* violation of Christensen's constitutional rights against cruel and unusual suffering, and was a cause of her death.

86. Defendants knowingly failed to implement a proper mental health care program to identify and then properly evaluate their inmates for mental illness.

87. Defendants knowingly failed to implement procedures and recordkeeping whereby inmates with serious mental illnesses are not unnecessarily subjected to the harsh and unforgiving confines of prolonged solitary confinement, which is known to increase the potential for suicide due to the inherent stress of those conditions.

88. Defendants systemic and gross deficiencies in staffing, training and procedures of the Vilas County Jail effectively denied access to adequate medical care for Christensen and others similarly situated.

89. The defendants' constitutional violations referenced above were committed in conscious disregard of a known risk to Christensen's mental health and physical well-being.

**COUNT I AGAINST ALL NAMED DEFENDANTS —FAILURE TO PROTECT IN VIOLATION OF FOURTEENTH AMENDMENT UNDER 42 U.S.C. §1983**

17

90.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if fully set forth in this Count.

91.     Count I is alleged against all the individual defendants.

92.     Under settled United States Supreme Court authority, and in accordance with the Fourteenth Amendment, Christensen was entitled to be free from a known and unreasonable risk of serious harm, as well as to be free from cruel and unusual punishment, while in the custody of the Vilas County Jail.

93.     Under settled United States Supreme Court authority, and in violation of the Fourteenth Amendment, the individual defendants maliciously knew of and disregarded a substantial risk of serious harm to Christensen by:

      a.   refusing to provide any medical evaluation or treatment for her serious medical needs;

      b.   putting her into prolonged solitary confinement without any medical evaluation of her serious mental illness, and without justification;

      c.   failing to monitor and responds to her vulnerability to suicide and instead taunting her provided the unobstructed means to do so.

94.     The defendants knew of and disregarded their actions described herein would cause Christensen to suffer cruel and unusual punishment to the point where she would commit suicide, as had occurred previously.  In the alternative, the individual defendants disregarded an obvious risk of highly probable and serious harm.

95.     The individual defendants' actions and omissions were undertaken with malice and/or reckless disregard for Christensen's constitutional right to be free from cruel and unusual punishment.

96.     The defendants' actions and omissions were the direct and proximate cause of the violations of Christensen's constitutional rights, and resulting pain and suffering prior to her death, of Christensen's death, and all of the legally recoverable damages suffered by her and her heirs.

**COUNT II AGAINST WILLIAM WEISS—MONELL CLAIM UNDER 42 U.S.C. §1983**

97.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth in the preceding paragraphs as if fully set forth in this Count.

98.     Count II is alleged against defendant Sheriff Fath in his official capacity.

99.     Upon information and belief, Vilas County does not have any medical professional to evaluate mental illness.

100.     During the relevant time period, defendant Sheriff Fath had notice of widespread practices by employees at the Vilas County Jail under which detainees with mental health issues were routinely denied access to proper mental health treatment, and detainees who were at risk of suicide were routinely placed in solitary confinement without consideration of mental illness. These widespread practices are a result of the lack of clear formal policies, training, and supervision on the proper way to deal with detainees with mental health problems, including not placing mentally ill persons into solitary confinement without any medical or psychological evaluation or consideration. These widespread practices were allowed to flourish—and become so well settled as to constitute de facto policy of the Vilas County Sheriff's Department—because governmental policymakers and authority over the same, namely, Sheriff Fath, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

101.     Christensen's injuries and damages, and ultimately her death, were caused in substantial part by these widespread policies, practices, and procedures recklessly promulgated by

19

the Vilas County Sheriff's Department. These policies, practices, and procedures that were the cause of Christensen's injuries had previously caused the same outcome in other individuals.

## COUNT III AGAINST ALL DEFENDANTS—SURVIVORSHIP CLAIM

102.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth in the preceding paragraphs as if fully set forth in this Count.

103.    Count III is alleged against all the individual defendants.

104.    By their acts and omissions, the individual defendants breached their duty to Christensen to provide medical evaluation and treatment for her obvious medical needs, which was the proximate cause of pain, suffering and anguish leading up to her death.

105.    By their acts and omissions, the individual defendants breached their duty to Christensen not to force her into conditions of prolonged solitary confinement without justification, which was the proximate cause of pain, suffering and anguish leading up to her death.

106.    The individual defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Christensen's rights.

107.    Christensen's next of kin are her parents.

108.    Plaintiffs, as administrators of the estate and on behalf of the next of kin, claim damages pursuant to the common law for Christensen's conscious pain and suffering while in solitary confinement up to and including the moments in which she acted to take her life, pursuant to common law.

## COUNT IV AGAINST ALL DEFENDANTS—WRONGFUL DEATH CLAIM

109.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth in the preceding paragraphs as if fully set forth in this Count.

110.    Count IV is alleged against all the individual defendants.

111.    By their acts and omissions, the individual defendants failed to provide any medical treatment to Christensen for her obvious mental illness and vulnerability to suicide, and placed her into prolonged solitary confinement, which was the proximate cause of her death and the injuries to her heirs.

112.    The individual defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Christensen's rights.

113.    Christensen's next of kin are her parents.

114.    Plaintiffs, as administrators of the estate and on behalf of the next of kin, claim damages for the wrongful death of Christensen, and for the loss of her services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, as well as for the mental anguish caused by this loss, as well as for funeral and other expenses and damages pursuant to the Wisconsin Statutes.

### COUNT V—STATE LAW CLAIM FOR RESPONDEAT SUPERIOR

115.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth in the preceding paragraphs as if fully set forth in this Count.

116.    Count V is alleged against defendant Sheriff Fath.

117.    In committing the acts alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the Vilas County Sheriff's Department, acting at all relevant times within the scope of their employment.

118.    Defendant Sheriff Fath is liable as principal for all torts committed by his agents.

### COUNT VI—STATE LAW CLAIM FOR INDEMNIFICATION

119.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth in the preceding paragraphs as if fully set forth in this Count.

120.    Count VI is alleged against defendant Vilas County.

121.    Wisconsin law provides that public entities are required to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

122.    The individual defendants were employees of the Vilas County Sheriff's Department who acted within the scope of their employment in committing the misconduct described above.

123.    Vilas County is obligated to pay any judgment entered against their employees in an official capacity.

WHEREFORE, judgment is demanded for compensatory damages, costs and attorneys' fees, and punitive damages against each of the defendants in their individual capacities, and for such further additional relief as this Court may deem appropriate and just.

**PLAINTIFFS REQUEST A TRIAL BY JURY OF 12**

**MCCOY LEAVITT LASKEY LLC**
Attorneys for Plaintiffs

Date: _____5/6/22_____    By: _*Electronically signed by Michael D. Aiken*_
Michael D. Aiken          SBN 1060331
N19 W24200 Riverwood Drive, Ste. 125
Waukesha, WI 53188
Phone: (262) 522-7000
Fax: (262) 522-7020
maiken@mlllaw.com

AND

**HAVAS & JOY, SC**
Jeffrey A. Joy          SBN 1024222
7949 N. Port Washington Road
Glendale, WI 53217-3136
Phone: (414) 271-7300
Fax: (414) 271-7301
jjoy@havasandjoy.com

22