IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL CHRISTENSEN and PAULA
CHRISTENSEN, as next of kin to DONNA
CHRISTENSEN, and as special administrator to her
estate,

                Plaintiffs,

    v.

WILLIAM WEISS, SHERIFF JOSEPH FATH, VILAS
COUNTY, KAYLA ZIEMBA (F/K/A/ KAYLA
ANDERSON), OFFICER BRENT
WILMOT, JOHN AND JANE DOE OFFICERS 1-10,
ADVANCED CORRECTIONAL HEALTHCARE,
GREGORY SCOTT, LINDA THAYER, and
ABC INSURANCE COMPANIES 1-10,

                Defendants.

                                        OPINION and ORDER

                                        22-cv-253-jdp

---

Twenty-year-old Donna Christensen was booked into the Vilas County jail on a probation hold. Early in her stay, she was placed on suicide watch, but she was released to the general population two days later. Eighteen days after being taken off suicide watch, she hanged herself in her cell in the jail's D-block, where she was the only prisoner at the time. Jail staff tried to revive her, unsuccessfully.

Christensen's parents, acting as next of kin and as administrators of Donna's estate, filed this suit under 42 U.S.C. § 1983 against two groups of defendants who they say were responsible for Donna's death: (1) Vilas County, Vilas County Sheriff Joseph Fath, jail administrator William Weiss, and jail sergeant Brent Wilmot; and (2) the jail's contracted medical service provider, Advanced Correctional Healthcare (ACH), along with three of its employees, social worker Kayla Ziemba (formerly Kayla Anderson), registered nurse Linda Thayer, and physician's assistant Gregory Scott. Dkt. 20. They assert Eighth and Fourteenth

Amendment claims against all the individual defendants, municipal liability claims against the county and ACH, a state law negligence claim against Thayer, and a handful of other state law claims against the county and its employees.

Now before the court are defendants' motions for summary judgment. Dkt. 36 (by ACH, Ziemba, Thayer, and Scott) and Dkt. 44 (by Vilas County, Fath, Weiss, and Wilmot).[1] Defendants argue that they can't be found liable for Christensen's suicide because there's no evidence that any of them was aware of the risk that Christensen would imminently take her own life or that they intentionally disregarded any such risk. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (to prove Eighth Amendment deliberate indifference based on failure to prevent suicide, plaintiffs must prove that defendants subjectively knew the prisoner was at substantial risk of committing suicide and intentionally disregarded the risk). As they point out, Christensen expressed suicidal thoughts and erratic behavior early in her stay, but she appeared to stabilize after two days on suicide watch. From then until her death 18 days later, she consistently denied feeling suicidal, made no requests for counseling or mental health treatment, and exhibited no strange or concerning behavior.

Plaintiffs don't dispute any of this. They concede that they can't prevail in showing that any of the defendants was aware of a substantial risk that Christensen would commit suicide. Instead, they advance more roundabout theories, blaming Christensen's death on her conditions of confinement, excessive force and due process violations by Wilmot, Ziemba's alleged lack of qualifications, or some combination of the above. But as discussed below, there's

---

[1] Plaintiffs filed an untimely cross-motion for partial summary judgment on defendants' claim of qualified immunity. Dkt. 52. The court will deny this motion. The court does not reach the question of qualified immunity because it concludes that no defendant violated Christensen's constitutional rights.

no evidence to support any of these alternate theories of wrongdoing, much less that any defendant's allegedly wrongful actions caused Christensen's death. So defendants are entitled to summary judgment on plaintiffs' federal claims.

As for plaintiffs' state-law claims, the general rule is that the court should not resolve state-law claims in a case like this one in which the court has jurisdiction over the claims solely because they are related to federal claims that are being dismissed. No party identifies a reason to keep the state-law claims, so if plaintiffs want to pursue those, they will have to do so in state court.

## BACKGROUND

The following facts are taken from the parties' proposed findings of fact and the record, including video recordings taken at the jail. They are undisputed unless otherwise noted.

### A.  Christensen's admission to the Vilas County jail

On October 1, 2020, Christensen was booked into the Vilas County jail on a probation hold. The jail's booking officer, Austin Calderon, administered an intake questionnaire that asked Christensen about her current medical and mental health. Christensen answered "no" to all the questions, indicating that she had no concerns. She reported that she was not suicidal, had not experienced any major problems recently, had never attempted or contemplated suicide, and that she was not presently contemplating suicide. Recording his own observations of Christensen, Calderon noted no observable mental health problems, no signs of injury, no indications that Christensen was under the influence of drugs or alcohol, and no behavior that would suggest a risk of suicide. However, Christensen's urinalysis results later came back positive for the presence of amphetamines, methamphetamines, and THC.

At the time Christensen was admitted, the jail was taking precautions to prevent the spread of the coronavirus. All inmates booked into the jail were placed on COVID-19 quarantine status for 14 days whether they tested positive for the virus or not. During this two-week quarantine period, inmates were required to remain in their cells all day except for one hour alone out in the dayroom.

On October 3, a physician ordered Christensen to take a COVID test. She was moved from a receiving cell to a medical segregation cell to await the results.

**B. October 6–8**

**1. Interaction with Wilmot on October 6**

Around 2 p.m. on October 6, while still in the medical segregation cell, Christensen asked for soap from correctional officer Samantha Malone, who was doing rounds. When Malone told Christensen that she would bring her the soap during the next set of rounds, Christensen began kicking the door of her cell and screaming. Malone responded by turning off the TV that was viewable from Christensen's cell door. Christensen then smashed the TV remote on the floor of her cell and covered the window in the door with toilet paper. She proceeded to kick the door of her cell, scream, and cry, before calming down about 30 minutes later. At some point, Sergeant Brent Wilmot told Christensen over the intercom that if she wanted soap, she needed to stop acting like a 12-year-old throwing a temper tantrum.

At 2:32 p.m., Malone entered Christensen's cell to retrieve the remote. Wilmot stood in the open doorway, directly in Christensen's line of sight. Christensen threw a Styrofoam container with food in it in Wilmot's direction. Wilmot then entered the cell to remove Christensen's mattress and blanket as a sanction for her behavior. Wilmot pulled the mattress out from under Christensen while she was still lying partly on it. Christensen then stood up

4

and shoved Wilmot.[2] Dkt. 59 (placeholder entry for videos), Ex. 20, at 2:32:17-:18 (video from Seg Hall 2). Wilmot responded by physically restraining Christensen against the bunk in her cell for approximately 10 seconds as Officer Malone finished removing the contents of the cell.

During the incident, Christensen stated, "Like that's gonna stop me from killing myself" and said that she heard voices telling her to kill herself. As a result, Malone and Wilmot removed her from her cell and took her to a holding cell to be placed on suicide watch.

While being changed into a smock, Christensen told Wilmot and Malone that she was "bipolar" and was "normal" when she used meth. She requested a vegan meal tray, stating that she was vegan now because people on the "outs" were "eating other people." When asked if she was taking anything for her asserted bipolar disorder, she replied, "No, but I should be." During this exchange, Christensen admitted to Wilmot that she had shoved him.[3] Dkt. 59, Submission 2, Ex. 28 at 1:16.58 ("I barely shoved you.").

## 2.  Disciplinary sanction

Wilmot gave Christensen a 10-day disciplinary sanction of administrative segregation for shoving him in the med-seg cell. Ten days is the maximum punishment available and is the standard discipline issued to all inmates who place their hands on an officer or throw something at an officer. Like inmates serving their 14-day COVID quarantine period, inmates on administrative segregation must remain in their cells for 23 hours a day, with one hour in the

---

[2] Plaintiffs dispute this. According to plaintiffs, when Wilmot pulled the mattress, he caused Christensen to "fall forward up and into [Wilmot] unintentionally." Dkt. 73, ¶ 31 (Plt.'s Prop. Findings of Fact). As discussed further below, this version of events is plainly contradicted by the video evidence and by Christensen's admission later that day that she had shoved Wilmot.

[3] Plaintiffs have submitted a statement from Christensen to her probation officer in which she denied that she pushed Wilmot, Dkt. 59-23, but that evidence would not be admissible under any exception to the hearsay rule.

dayroom. They cannot have physical contact with other inmates, but can talk to other inmates through their cell doors.

Wilmot presented the notice to Christensen on October 6 while she was in the holding cell on suicide watch; their conversation is recorded on audio and video. Dkt. 59-32, Bullpen (20) Video Recording at :35-:50. Wilmot told Christensen that her 10 days of discipline was starting immediately. Christensen responded that "10 days is a long time to be alone." Wilmot told Christensen that if her COVID test came back negative, he would "put her by people." Referring to the disciplinary sanction, Wilmot asked Christensen if she wanted to "appeal it to the next shift or accept it." Christensen responded that she would accept it, and she signed the notice waiving her right to a due process hearing.

Under the jail's security policy, inmates who receive more than five days of discipline are subject to a review of their security status. Applying this policy, unknown jail staff (who are not defendants) re-classified Christensen from a low-medium security inmate to a maximum-security inmate. Maximum security inmates are confined to their cells 23 hours a day but can have access to their personal belongings, television, and reading materials. They can use the dayroom for one hour a day, where they can use the phone, access the television controls, and take a shower. They are not allowed any physical contact with other inmates, but can talk to other inmates through their cell doors. Maximum-security inmates are transported in handcuffs, waist chains and leg irons. Inmates are subject to security reclassification every 30 days.

### 3. Suicide watch

After placing Christensen on suicide watch on October 6, jail staff contacted Kayla Ziemba, who was the jail's designated Qualified Mental Health Professional. Ziemba was

employed by Advanced Correctional Health Services, Inc., which had contracted with Vilas County to provide medical services to inmates at the jail.

At the time, Ziemba was certified by the state of Wisconsin as an advanced practice social worker. *See* Wis. Stat. § 457.08(2). She was in the process of obtaining her license to be a clinical social worker, which required her to have "at least 3,000 hours of clinical social work practice, including at least 1,000 hours of face-to-face client contact that includes the diagnosis and treatment of individuals based on the applicable edition of the Diagnostic and Statistical Manual of Mental Disorders, or its equivalent," under appropriate supervision. Wis. Stat. § 457.08(4)(c). Ziemba was supervised, remotely, by Dr. Melissa Caldwell, Director of Behavioral Health Services for ACH. Dr. Caldwell has a doctorate in clinical and forensic psychology, is a Certified Correctional Health Professional, and is an appropriate supervisor under state law. Wis. Stat. § 457.08(4)(c)3. Under Dr. Caldwell's supervision, Ziemba was permitted to perform the duties of a licensed clinical social worker. Wis. Stat. § 457.04(4).

On October 7, Ziemba met with Christensen to assess her suicide risk. Ziemba was familiar with Christensen, having seen her multiple times earlier that year at the jail while Christensen was serving time from January to May 2020. During a mental health screening during that earlier jail stay, Ziemba had noted that Christensen reported a past history of suicide attempts. Ziemba also knew Christensen from providing social services to Christensen's family when Christensen was a juvenile.

When Ziemba evaluated Christensen on October 7, 2020, Christensen told Ziemba that she had thoughts of self-harm "all the time" and heard voices telling her to kill herself. Based on these statements, Ziemba determined that Christensen should remain on suicide watch.

Ziemba met with Christensen again the next day. Christensen was alert and oriented and denied any thoughts of self-harm. Christensen said she had a headache and was shaky, which she attributed to drug withdrawal. Ziemba noted that Christensen had good protective factors in place, including family. Based on her interview and observations of Christensen, Ziemba recommended that Christensen be removed from suicide watch and returned to general population. Jail staff removed Christensen from suicide watch at approximately 12:45 p.m. on October 8.

That same afternoon, Christensen's COVID test came back negative. Christensen was transferred to a cell in the D-block of the jail, where she remained until her death on October 26.

## C.  October 8–26

### 1.  Ziemba and Thayer's treatment of Christensen

Ziemba followed up with Christensen via TeleHealth on October 12. Ziemba observed that Christensen was alert and oriented. Christensen told Ziemba that Christensen had scared herself by her actions on October 6 and that she believed that she had acted that way because of her prior drug use, from which she was withdrawing. Christensen said she was "bipolar" and had episodes of "spazzing out," but not in front of authority figures. She denied any ongoing thoughts of self-harm. Ziemba gave Christensen "provisional" diagnoses of "situational distress" and "polysubstance abuse," and determined that she was stable in the general population. Ziemba determined that Christensen's mental health needs were not serious. She offered support and encouragement, and discussed "self-worth and recovery issues" with Christensen.

On October 16, Christensen was seen by Linda Thayer, a registered nurse contracted by ACH. Thayer met with Christensen to conduct a medical history and health appraisal. Thayer noted that Christensen was alert and calm. Christensen told Thayer that she was not under the care of a practitioner outside of the jail and was not on any medications. She denied any thoughts of self-harm, a history of suicide attempts, thoughts of harming others, a history of violence toward others, a history of being victimized, or a history of sexual assault. She acknowledged that she occasionally used alcohol, THC, and methamphetamine.

On October 20, Ziemba followed up with Christensen in person and noted nothing remarkable. Christensen continued to deny thoughts of self-harm or suicide. She did not request any mental health care. Ziemba did not see Christensen after that, nor was she told by anyone that Christensen had reported any further self-harm or suicidal ideations or asked to see someone about her mental health.

On October 22, Christensen submitted a sick call request, asking to be seen for an eczema flare-up on her arms. Christensen was seen by Thayer, who ordered a prescription ointment to treat the eczema. Christensen did not raise any other complaints when she met with Thayer that day.

## 2. Christensen's conditions of confinement and death

The D-block housed only female inmates, who were fewer in number than the male inmates in the jail. *See* Malone Dep., Dkt. 71, at 55:19–25. From October 8–16, there was at least one other inmate besides Christensen on the D-block. However, from October 16 until her death 10 days later, Christensen was the only inmate on the block because of inmate releases or housing reassignments. This was not because she was on solitary confinement or other disciplinary segregation; rather, it was because the mix of inmates resulted in no other

inmates being assigned to the block during those 10 days. It is unclear from the record where Christensen would have been housed or what her conditions of confinement would have been had she not been classified as a maximum-security inmate.

Christensen's 10-day disciplinary sanction ended on October 16. For all but the last two days of that period, Christensen was also under precautionary COVID quarantine. On October 16, when her discipline ended, her inmate privileges were restored, including the ability to use the phone, to have personal belongings in her cell, and to have access to television and reading materials. After her privileges were restored, she spoke several times by phone and by video with a friend named Sandy. She also spoke on the phone with her father, mother, and other family members. No one contacted the jail to report a concern for Christensen's well-being at any time before her suicide.

On October 26, jail staff performed documented cell checks of Christensen every hour. No one reported any concerning statements or behavior by Christensen that day or evening. At around 8 p.m., Christensen had a 20-minute video visit with her friend Sandy. On the video available from the D-block, Christensen can be heard crying for about 10 minutes after the visit. At 8:48 p.m., two jail guards entered the cell block and one entered Christensen's cell to remove a bag of trash; neither officer reported seeing or hearing anything unusual. Another guard did a cell check at 9:30 p.m.; she, too, reported nothing unusual. Christensen was discovered hanging by a bedsheet tied to her bunk during the next cell check at around 10:30 p.m. Efforts to revive her were unsuccessful.

ANALYSIS

Plaintiffs assert constitutional and state-law claims against two groups of defendants: (1) Vilas County and its employees, Wilmot, Weiss, and Vilas County Sheriff Hath; and (2) ACH and its employees, Thayer, Ziemba, and Gregory Scott, a physician's assistant. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co.*, LLC, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Plaintiffs are entitled to the benefit of inferences supported by admissible evidence, but not those "supported by only speculation or conjecture." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and quotation marks omitted).

Plaintiffs have dropped their claims against defendant Scott, and they haven't attempted to meet any of the tests for municipal liability with respect to the county, so those claims will be dismissed without further discussion.[4] *See John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 614 (7th Cir. 2021)("A party who does not sufficiently develop an issue or argument forfeits it."). As for the remaining defendants, the court will begin with plaintiffs' constitutional claims against the county employees, then address their constitutional claims against ACH and its employees, and finally the state-law claims.

---

[4] The court will also dismiss John and Jane Doe Officers 1-10, whom plaintiffs have never identified. Even though discovery in this case is not closed, the court will not allow plaintiffs to amend their complaint to identify these defendants at this late stage of the case.

**A. Constitutional claims against the Vilas County defendants**

At first blush, plaintiffs' complaint appears to assert an Eighth Amendment claim against the Vilas County defendants based on their failure to prevent Christensen's suicide. Dkt. 20. To prove such a claim, plaintiffs must provide evidence from which a reasonable jury could conclude that: (1) Christensen had an objectively serious medical condition; (2) the defendant in question knew of the condition and deliberately failed to treat Christensen; and (3) this failure injured Christensen. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). A serious medical condition is one that "has been diagnosed by a physician . . . or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). There is no dispute that suicidality is an objectively serious medical condition.

As plaintiffs concede, there is no evidence that any of the Vilas County defendants was aware that Christensen was suicidal at any time after she was released from suicide watch on October 8, or even that they had any interactions with her from that point on. But as noted at the outset of this opinion, plaintiffs expressly disavow that they are contending that any of the defendants consciously disregarded the specific risk that Christensen would commit suicide. Instead, plaintiffs say they are seeking to hold "prison officials accountable for pain and suffering that [Christensen] wrongly [was] subjected to during periods of isolation in solitary confinement while she was alive, as a consequence of Officer Wilmot unjustly placing her in extreme segregation in the first place[.]" Dkt. 58, at 12. More specifically, plaintiffs contend that Wilmot: (1) used excessive force on her during the confrontation in the med-seg cell on October 6, in violation of the Eighth Amendment; and (2) violated Christensen's right to due

process when he disciplined her, either by fabricating the charge or by coercing her into waiving her right to a due process hearing. *Id.*, at 20–24. Further, the argument goes, Wilmot is responsible for Christensen's death, because her suicide was a foreseeable consequence of these constitutional violations. *Id.*, at 12. (Weiss and Hath are also liable, argue plaintiffs, because they failed to review Wilmot's use of force or his disciplinary sanction. *Id.*, at 13–15.)

Plaintiffs' theory requires some unraveling. According to plaintiffs, when Wilmot entered the med-seg cell on October 6 and pulled the mattress out from under Christensen, he wasn't engaged in a good faith effort to restore discipline but rather was trying to cause Christensen to be "thrown into physical contact with him." *See Wilborn v. Ealey*, 881 F.3d 998, 1006 (7th Cir. 2018) (correctional officers violate the Eighth Amendment when they use force not in a good faith effort to maintain and restore discipline, but maliciously and sadistically for the very purpose of causing harm). Plaintiffs say Wilmot did this so that he could falsely discipline her for putting her "hands on" an officer, which he knew would cause Christensen to be reclassified as a maximum-security inmate. As a result, their theory goes, Christensen was reclassified as a maximum-security inmate and housed in the jail's D-block, where the conditions of confinement were so "extreme" and "prolonged" that—when combined with ACH's failure to treat Christensen's "obvious mental illness"—they caused Christensen to take her own life.

Plaintiffs' theory of liability fails for multiple reasons. The court will focus on three of them: (1) the evidence shows that Wilmot did not use excessive force; (2) Christensen was deprived of no legally protected liberty interest, so there was no due process violation; and (3) plaintiffs haven't shown that Christensen's conditions of confinement were unduly harsh, much less that they caused her to commit suicide.

1. **Wilmot did not engage in excessive force**

Plaintiffs' foundational premise—that Wilmot pulled the mattress out from Christensen in order to "thrust Christensen into physical contact with him against her will," Dkt. 58, at 2—is flatly contradicted by the video evidence. The video from the camera in Seg Hall 2 plainly shows Christensen pushing Wilmot, as depicted below:



Dkt. 59 (placeholder entry), Submission 2, Ex. 20, at 2:32:17-:18. The video does not show that Christensen "fell" into Wilmot as he pulled the mattress out from under her, as plaintiffs argue. And Christensen admitted a few hours later that she shoved Wilmot. Wilmot wasn't the aggressor, Christensen was. No reasonable jury could conclude from the video evidence that Wilmot engaged in excessive force. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (where party's version of events is shown by videotape to be "visible fiction," court may disregard it).

### 2.  Christensen was not deprived of due process

Under the Fourteenth Amendment, state officials cannot "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. But as plaintiffs acknowledge, due process is required only when punishment implicates a protected liberty interest by extending the duration of confinement or imposing "an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). It is unclear from plaintiffs' submissions whether plaintiffs are challenging Christensen's 10-day term of disciplinary segregation or the change in her security classification (it appears to be the latter), but neither one involves a protected liberty interest. *See Lucien v. DeTella,* 141 F.3d 773, 774 (7th Cir. 1998) ("classifications of inmates implicate neither liberty nor property interests"); *Hoskins v. Lenear,* 395 F.3d 372, 374 (7th Cir. 2005) (loss in privileges and two months in segregation did not trigger due process concerns); *Lekas v. Briley,* 405 F.3d 602, 610–14 (7th Cir. 2005) (even ninety-day placement in disciplinary segregation where inmate was "prohibited from participating in general population activities," deprived of contact with other inmates, and barred from "educational and work programs" did not trigger due process concerns). This is true even if plaintiffs could somehow show that the disciplinary report was fabricated. *Hoskins,* 395 F.3d at 375.

### 3.  Plaintiffs haven't shown that Christensen's conditions were severe

Finally, plaintiffs' central contention, namely, that Christensen was subject to "prolonged," "inhumane," "solitary," or "extreme" confinement, is supported with nothing but their own *ipse dixit.* Plaintiffs haven't developed evidence showing what Christensen's conditions were like, how they differed from those enjoyed by minimum or medium security inmates, what placement alternatives were available, or why a different placement alternative

would have reduced the likelihood that Christensen would kill herself. All plaintiffs have shown is that Christensen was the only inmate in the D-block from October 16–26 and that she was allowed an hour out of her cell each day. They haven't developed evidence showing what opportunities she had for social interaction during that time or what those opportunities would have been had she had a different security classification. Plaintiffs aren't entitled to an inference that Christensen's death was caused by her security classification or housing conditions without explaining what those conditions were or presenting evidence to suggest that her death wouldn't have occurred had she been housed somewhere else in the jail. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666–67 (7th Cir. 2012) ("It is not too much to expect the Estate's lawyers, when complaining about the debilitating effects of the jail's housing decisions, to identify feasible alternatives and to tender evidence supporting the contention that [Christensen] likely would have fared better in one of those alternative placements.").

Plaintiffs seem to presume that the absence of other inmates on the block was enough to provoke Christensen's suicide. Prolonged isolation is unhealthy, but plaintiffs adduce no evidence that it caused Christensen's suicide. It's undisputed that Christensen didn't complain to anyone about the conditions on the D-block, ask to speak with a crisis counselor or other staff about mental concerns, or exhibit any strange behavior or signs of mental decompensation. Christensen may well have been acutely lonely, but she kept it to herself.

Plaintiffs also adduce no evidence that defendants were aware that Christensen was at risk of suicide. Plaintiffs point to Christensen's agitated behavior, crying, and suicide threats while housed in the med-seg cell 20 days earlier. According to plaintiffs, this shows that Wilmot knew that Christensen was prone to "mental breakdown" under "extreme confinement." Once again, plaintiffs offer nothing but bare conclusions in support of this assertion. They don't

attempt to demonstrate that the conditions of Christensen's confinement as a maximum-security inmate on the D-block were as "extreme" as they were in medical segregation. And they don't adduce any reliable medical evidence, expert or otherwise, to support their lay contention that Christensen's behavior on October 6 was caused by her confinement (as opposed to drug withdrawal, for example). Finally, there is no evidence that Christensen exhibited any of the same behaviors once she was moved out of the med-seg cell and into the D-block.

In sum, plaintiffs have failed to produce evidence sufficient to show that Wilmot consciously disregarded a substantial risk that Christensen would commit suicide, that he violated her constitutional rights in other ways, or that Wilmot's decisions had anything to do with Christensen's decision to take her own life nearly three weeks later. And absent a constitutional violation, there is no basis for supervisory liability to attach against Hath and Weiss. *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (supervisor not liable under § 1983 absent evidence of a constitutional deprivation). So the court will dismiss the § 1983 claims against the Vilas County defendants.

## B.  Constitutional claims against ACH defendants

Plaintiffs assert Eighth Amendment claims against Thayer, Ziemba, and ACH.[5] As with their claims against the county defendants, plaintiffs don't argue that ACH or its employees were aware that Christensen was at substantial risk of committing suicide. Instead, they argue that the ACH defendants consciously disregarded Christensen's "obvious signs of mental

---

[5] Although it is still unsettled whether claims brought by inmates on a probation hold are governed by the Eighth Amendment or the Fourteenth, *see Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017), plaintiffs have taken the position that the Eighth Amendment applies, so the court will do the same.

illness." *See Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017) (parents of inmate who died by suicide could proceed on claim that prison officials violated son's constitutional rights by providing inadequate mental health treatment, regardless whether son had particular vulnerability to suicide). The court addresses the claim against each of these defendants in turn.

### 1. Thayer

Thayer was the nurse who conducted a medical assessment of Christensen on October 16 and then saw her a few days later for her eczema. It is undisputed that Thayer saw Christensen only twice during her October jail stay and that Christensen did not say or do anything during those interactions that would have suggested that she was contemplating suicide, that she had any mental health concerns, or that she had an acute mental illness. Plaintiffs haven't explicitly abandoned their claim against Thayer, but they concede that they don't have sufficient evidence to defeat summary judgment in her favor.[6] Dkt. 57, at 2. So plaintiffs' Eighth Amendment claim against Thayer will be dismissed.

### 2. Ziemba

Plaintiffs fare no better with their claim against Ziemba. Even accepting that Christensen had a serious medical need for mental health care, plaintiffs haven't provided evidence that would allow a jury to conclude that Ziemba consciously disregarded it. It is undisputed that Ziemba *did* provide Christensen with treatment, assessing her four times in

---

[6] Plaintiffs filed a motion under Fed. R. Civ. P. 56(d), asking the court for more time to oppose Thayer's motion for summary judgment. Dkt. 49; Dkt. 57, at 2. This court denied that motion. Dkt. 61; Dkt. 65; Dkt. 72. Nothing in the parties' summary judgment submissions suggests that that ruling was in error or that plaintiffs could establish a viable claim against Thayer even if they had been allowed more time.

two weeks, provisionally diagnosing her with situational distress and polysubstance abuse, and offering support and encouragement. Plaintiffs have provided no evidence suggesting that Ziemba's assessment was wrong, much less that her response was "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

This case bears no similarity to *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), a case cited by plaintiffs. In *Greason*, the prison's psychiatrist abruptly discontinued the inmate's anti-depressant medication without conducting a mental status examination or reviewing the inmate's file; had he read the file, he would have learned that Greason "was a schizophrenic with an extensive history of mental illness and numerous hospital admissions for psychiatric treatment" and that other mental health professionals had indicated that Greason would pose a substantial suicide risk if he was without anti-depressants. *Id*. at 835. Here, by contrast, there are no records indicating that Christensen had ever been diagnosed with a mental impairment, hospitalized for psychiatric treatment, or prescribed any psychotropic or other medications for a mental condition.

Still, plaintiffs insist that Ziemba's care was constitutionally inadequate in two ways. First, they argue that as an advanced practice social worker, she was unqualified to provide "medical" treatment for mental illness; in their view, the only proper response was to refer Christensen to a psychiatrist. Dkt. 57, at 10–14. This argument is unpersuasive. It is undisputed that Ziemba was qualified under state law to provide clinical social work, defined as services "for the diagnosis, treatment, and prevention of mental and emotional disorders," under the supervision of a psychologist like Dr. Caldwell. Plaintiffs cite no case establishing an

19

Eighth Amendment requirement that inmates be treated only by persons holding medical degrees or that a psychiatric referral is required any time an inmate admits to suicidal thoughts, much less evidence showing that Ziemba was aware of this requirement and ignored it.

Second, plaintiffs assert that Ziemba failed to evaluate Christensen "upon placement in prolonged, extreme segregation." Dkt. 57, at 5. This assertion has no facts to support it. As already discussed, plaintiffs haven't shown that Christensen's conditions of confinement were either prolonged or extreme, much less that they had any effect on her mental health. Her conditions were nowhere near as severe as those in *Palakovic*, 854 F.3d at 217, where the inmate had been subject to "multiple 30–day stints in solitary confinement" in a tiny cement cell of less than 100 square feet with only small slit windows, during which time he "was not permitted to make phone calls, his possessions were limited to one small box, and his social interaction and environmental stimulation were severely reduced." What's more, assuming that plaintiffs are referring to the time period when Christensen was the only inmate in the D-block, Ziemba saw Christensen during that time, visiting her on October 20.

Plaintiffs have failed to come forth with any evidence supporting an inference that Ziemba consciously disregarded Christensen's mental health needs, so Ziemba is entitled to summary judgment. But their claim also would fail for lack of causation. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012)(causation is necessary element of any constitutional tort). Causation has two components: cause-in-fact and proximate cause. *Id.* Cause-in-fact means that "the injury would not have occurred absent the conduct," and proximate cause means that "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* Here, plaintiffs have provided no evidence from which

a factfinder could infer that, had Ziemba actually been a licensed psychologist or psychiatrist or referred Christensen to one, Christensen would not have committed suicide.

For the sake of completeness, the court notes that the outcome would not be any different had plaintiffs been allowed to submit the declaration from their purported expert, Amber Carda, Psy. D., which this court disallowed as untimely. *See* Dkt. 62-Dkt. 66; Dkt. 72 (denying reconsideration). Like plaintiffs, Carda doesn't identify anything specific that Ziemba did wrong; she merely offers the conclusory opinion that Ziemba's care was "grossly inadequate" because she wasn't a "properly licensed and qualified clinician" and because she placed Christensen into "extreme segregation" without evaluating her.[7] Dkt. 64–1. But Carda's opinion is based on the same false and conclusory premises as plaintiffs,' namely, that advanced practice social workers can't offer treatment for mental health disorders, that Christensen was subject to "extreme segregation," and that Ziemba didn't evaluate Christensen after she was moved to the D-block. Absent evidence to support these foundational assertions, Carda's declaration is unreliable and of little value.

In sum, plaintiffs have failed to provide evidence showing that Ziemba acted with a sufficiently culpable state of mind—*i.e.*, that she ignored a known and substantial risk of serious harm—in failing to have Christensen evaluated by a psychologist or psychiatrist, or that taking such action would have prevented Christensen's suicide. Accordingly, the § 1983 claim against

---

[7] Carda does state that Ziemba failed to conduct an "adequate" suicide risk evaluation, but she doesn't say *why* it was inadequate. It is well established that experts must provide more than just a bare conclusion. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court.").

Ziemba will be dismissed.

## C. ACH

Plaintiffs also seek to hold ACH responsible for Christensen's death under the framework established in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378–79 (7th Cir. 2017) (private corporations providing essential government services can be subject to corporate liability under *Monell* framework). To defeat summary judgment, plaintiffs must present evidence that ACH's "official policy, or an established custom, or a decision by a final decision maker, caused the alleged constitutional violation." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021). "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible," even if there is no individual liability by the institution's employees. *Id.*

Plaintiffs argue that ACH is liable for Christensen's death because Ziemba was not qualified to "evaluate, diagnose[] and treat mental illness at Vilas County jail." This theory is misguided, for two reasons.

First, plaintiffs' argument rests largely on their contention that Ziemba was not a Qualified Mental Health Professional ("QMHP"), as that term is defined by the National Commission on Correctional Healthcare, because the definition doesn't specifically include advanced practice social workers. But as ACH notes, plaintiffs' argument ignores the proviso that a QMPH can be a person "who by virtue of their education, credentials and experience are permitted by law to evaluate and care for the mental health needs of patients." As already discussed, Ziemba undoubtedly was qualified under Wisconsin law to provide this care. *See*

Wis. Stat. §§ 457.04(4), 457.08(4)(c)(3) (providing that an advanced practice social worker can practice clinical social work under appropriate supervision).

Second, whether Ziemba had the proper licensure is largely beside the point. Plaintiffs haven't provided any evidence that ACH was on notice of any inadequate inmate care by Ziemba. As the court of appeals has noted, "without evidence that [the employer] was on notice of inadequate inmate care by [the employee hired to conduct mental health assessments], we do not see how the full scope of [the employee's] qualifications is relevant to establishing [the employer's] deliberate indifference." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). The mental health professional in *Minix* had fewer qualifications than Ziemba: she had obtained course work, training, and other experience in fields such as community health, mental illness, and the treatment of prisoners, but, unlike Ziemba, lacked an advanced degree in psychiatry, psychology, or social work. *Id*. Just as the "full scope" of the employee's qualifications was irrelevant to establishing municipal liability in *Minix*, so it is here. Absent any evidence that ACH had a practice or policy that sanctioned or caused its employees to provide constitutionally inadequate medical care, plaintiffs' claim against ACH must be dismissed.

**D. State-law claims**

Plaintiffs assert negligence claims against Thayer and ACH, wrongful death claims against all defendants, and abuse of process, malicious prosecution, and promissory estoppel claims against the Vilas County defendants. They appear to rely solely on 28 U.S.C. § 1367, the supplemental jurisdiction statute, as the basis for subject matter jurisdiction over their state-law claims. *See* Dkt. 20, ¶ 19.

"Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). The court is dismissing all of plaintiffs' federal claims in this case. The parties have briefed the state-law claims, but no one has identified a reason why it would be appropriate for this court to retain jurisdiction. So the court will dismiss the state-law claims without prejudice to plaintiffs refiling them in state court.

## E. Conclusion

Christensen's death was tragic, and, perhaps, preventable. It is understandable that plaintiffs want to hold someone accountable. But plaintiffs have failed to adduce evidence that would support culpability under the demanding standards of the Eighth Amendment. The case must proceed, if at all, under state-law standards in state court.

ORDER

IT IS ORDERED that:

1.  Plaintiffs' motion for partial summary judgment, Dkt. 52, is DENIED.

2.  Defendants' motions for summary judgment, Dkt. 36 and Dkt. 44, are GRANTED on plaintiffs' federal claims. Plaintiffs' state-law claims are DISMISSED without prejudice to plaintiffs' refiling them in state court.

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered December 7, 2023.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge